*Decision will be entered for the petitioner.*

BERT B. RAND AND MYRA F. RAND, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76230. Filed March 20, 1961.

*Charles M. Trammell, Esq.*, for the petitioners.
*Peter P. Weidenbruch, Jr., Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the taxable year ended December 31, 1953, in the amount of $3,002.74.

The only error assigned is "The Commissioner erred in disallowing a deduction of $8,890.50 as 'fees' paid by petitioner Bert B. Rand to S. A. Carraway."

The facts were all stipulated and are incorporated herein by this reference.

Petitioners are husband and wife and during the year 1953 were residents of the District of Columbia. They filed a joint Federal income tax return for 1953 with the district director of internal revenue

at Baltimore, Maryland. Petitioner Myra F. Rand is involved herein solely by reason of having joined in the filing of the aforementioned return. Petitioner Bert B. Rand will hereinafter be referred to as the petitioner.

During the years 1952 and 1953 and thereafter, petitioner was engaged in the private practice of law in the city of Washington, D.C. During those years he was also engaged in the performance of services as a corporate official, as noted hereinafter.

Seaboard Machinery Corporation was incorporated in 1951 under the laws of the State of Delaware. Its principal place of business was at Panama City, Florida. On November 12, 1953, Seaboard Machinery Corporation was merged into Seaboard Maritime Corporation, a newly organized Florida corporation. Seaboard Machinery Corporation and its successor by merger, Seaboard Maritime Corporation, will hereinafter be referred to as the corporation.

Throughout the year 1953, petitioner owned not less than one-third of the outstanding capital stock of the corporation. The corporation was also indebted to him in an amount in excess of $60,000 on account of advances made to it by petitioner.

Prior to December 22, 1952, the corporation was engaged in the business of fabricating steel. On December 22, 1952, the corporation's plant was destroyed by fire.

Subsequent to December 22, 1952, the corporation's primary business activities were the liquidation of certain of its assets, the licensing of patents held by it, and the conduct of litigation which arose from the destruction of its plant and its inability to fulfill certain of its contractual commitments. At the present time, the corporation is engaged in the business of licensing patents and performing engineering services related thereto.

Throughout the year 1952 and until February 19, 1953, petitioner was president of the corporation and S. A. Carraway was vice president. On February 19, 1953, Carraway became president and petitioner became general counsel.

Prior to September 29, 1952, the salary authorized by the corporation's board of directors to be paid to its president was $36,000 per annum. Subsequent to September 29, 1952, and throughout the year 1953 the salary authorized to be paid by the corporation to its president was $30,000 per annum.

During the year 1952, throughout which petitioner was president of the corporation and Carraway, vice president, petitioner received $24,769.19 and Carraway received $13,374.18 from the corporation as compensation for their services.

During the year 1953, petitioner, who was president until February 19, 1953, and general counsel thereafter, received $8,307.65 from the corporation as compensation for his services.

During the year 1953, Carraway, who was vice president until February 19, 1953, and president thereafter, received $6,843.86 from the corporation as compensation for his services.

As president of the corporation, Carraway assumed responsibilities which were considerably more burdensome than those which had been his as vice president. He worked longer and harder than he had as vice president and was required to travel considerably more.

During the calendar year 1953, Carraway was paid $8,890.50 by petitioner. This payment was intended as additional compensation to Carraway for his services as president of the corporation.

The last four paragraphs of the stipulation of facts are as follows:

14. By letter dated May 14, 1956, petitioner submitted to the District Director of Internal Revenue affidavits executed by himself and Carraway relative to the aforementioned payment. True copies of these documents are attached hereto as joint exhibits, as noted:

|  | Joint Exhibit |
|---|---|
| Petitioner's letter dated May 14, 1956 | 2–B |
| Petitioner's affidavit dated May 14, 1956 | 3–C |
| Carraway's affidavit dated May 14, 1956 | 4–D |

15. The amount of $8,890.50 was included as an expense item in a separate schedule entitled "Schedule of Income and Expenses Other Than From Partnership," which was attached to Schedule C of the joint federal income tax return filed by petitioner and his wife for the year 1953.

16. During the years 1952, and 1953, Hans A. Nathan, petitioner's law partner and predecessor as general counsel of the corporation, received the amounts of $11,407.70 and $1,615.39, respectively, as salary for services performed as an officer of the corporation.

17. During the years 1954 through 1958, inclusive, petitioner's law firm received legal fees in the following amounts from DeLong Corporation on behalf of L. B. DeLong, indemnitor for the corporation:

|  | Amount |
|---|---|
| 1954 | $19,000.00 |
| 1955 | 12,000.00 |
| 1956 | 10,250.00 |
| 1957 | 12,000.00 |
| 1958 | 12,000.00 |

Petitioner has requested that we find as ultimate facts that the payment by petitioner to Carraway in 1953 of $8,890.50 represented "fees for services to Taxpayer" ("Taxpayer" being the petitioner herein); that such "fees" were reasonable in amount, bore a reasonable and proximate relation to petitioner's business as a necessary, appropriate, and helpful expense; and that such "fees" did not constitute an investment in a new enterprise and did not result in the acquisition of any capital assets.

It is true that in the agreement between petitioner and Carraway, dated December 23, 1953, referred to in the affidavits (Jt. Exs. 3–C, 4–D), it was stated that whereas during the years 1949 through 1953 petitioner and Carraway "have been involved in various business

matters of divers nature"; that as a result thereof petitioner had "advanced" to Carraway substantial sums of money, some of which advances the parties regarded as business loans and others of which were the subject of a dispute, petitioner maintaining them to be business loans, and Carraway maintaining "that these advances, originally regarded as business loans by mutual agreement, are to become fee payments for the extensive services performed by CARRAWAY for RAND during 1953, including but not limited to negotiations with E. A. Killoren and L. B. DeLong"; and that whereas both parties were desirous of settling any disputes in a spirit of fairness, it was agreed that the net sum of $8,890.50 should be "fee payments for services rendered in 1953." Regarding these so-called fee payments, petitioner in his affidavit (Jt. Ex. 3–C) states:

As Mr. Carraway's affidavit points out, the fees paid to him by myself for the year 1953 were paid in order to enable him to devote his time as an officer of the Seaboard Machinery Corporation * * *. The corporation itself could not afford to make a substantial payment to him which his services required. I was at the time an officer of that corporation and one of its largest stockholders. It was my belief that Mr. Carraway's services to the corporation were essential to protect an investment by me of what amounted to a considerable part of my savings.

Carraway, in his affidavit (Jt. Ex. 4–D), states in part thus:

Mr. Rand asked me early in 1953 if I would be willing to continue with Seaboard and to also handle some personal negotiations for him in connection with his Seaboard investment; if he would apply compensation for my services against my personal obligations to him, to the extent that the corporation could not compensate me. * * *

I was anxious to continue to do my best for the corporation. When Mr. Rand assured me that he would personally pay me a sufficient amount to make it possible for me to do this work, I agreed to the arrangements which were formalized in an agreement between Mr. Rand and myself dated December 23, 1953.

We do not think the agreement of December 23, 1953, together with the affidavits of petitioner and Carraway, warrants a finding of the ultimate facts requested by petitioner. We regard such ultimate facts asked for by petitioner as being in conflict with paragraph 13 of the stipulation of facts, which is as follows:

13. During the calendar year 1953, Carraway was paid $8,890.50 by petitioner. This payment was intended as additional compensation to Carraway for his services as president of the corporation.

The question of whether the $8,890.50 paid by petitioner to Carraway was for services rendered by Carraway to the *petitioner* or to the *corporation*, in our opinion, has been resolved by paragraph 13 of the stipulation. We hold the latter to be controlling. *Iowa Bridge Co.* v. *Commissioner*, 39 F. 2d 777, 780 (C.A. 8, 1930), reversing and remanding 14 B.T.A. 1048; *William C. Chick*, 7 T.C. 1414, 1425, affirmed on other grounds 166 F. 2d 337 (C.A. 1, 1948).

Petitioner contends that the amount he paid Carraway in 1953 is deductible from petitioner's gross income, either as a trade or business expense under section 23(a)(1) or as a nontrade or nonbusiness expense under section 23(a)(2) of the Internal Revenue Code of 1939, as amended.[1] The respondent contends that no part of the $8,890.50 is deductible from petitioner's gross income within the purview of any of the provisions of section 23, *supra*.

Section 39.23(a)–1 of Regulations 118 specifically provides that, in order to be deductible as a business expense, it is essential that it be established not only that the expense was an ordinary and necessary one but that it was "directly connected with or pertaining to the taxpayer's trade or business." Although the same regulations under section 23(a)(2) do not expressly include a parallel requirement, the case law under the latter subsection is clear in setting forth the requirement that an expense may be deducted by a taxpayer only if it is truly *his own* expense and not that of another taxpayer. See *Deputy* v. *duPont*, 308 U.S. 488; *Jacob M. Kaplan*, 21 T.C. 134, 145 (Issue V), appeal to C.A. 2 dismissed pursuant to stipulation, Nov. 26, 1954; *Harry Kahn*, 26 T.C. 273.

In the instant case, the expenditure of the $8,890.50 by petitioner was not an expense incurred by him in carrying on *his own* trade or business or incurred in the production or collection of *his own* income or for the management, conservation, or maintenance of property held *by him* for the production of income, but was compensation paid to a corporate officer for services which the latter rendered to the corporation.

The facts in the instant case are practically on all fours with the facts in *Harry Kahn*, *supra*. In that case the taxpayer was a corporate shareholder, officer, and creditor who had expended $2,108.12 of his own funds in entertaining customers of the corporation, which was operating at a loss at the time. Like petitioner here, he claimed the expenditure as a deduction under either section 23(a)(1)(A) or section 23(a)(2) of the 1939 Code. In denying the deduction under section 23(a)(1)(A), we deemed it sufficient to refer to the rule in *Deputy* v. *duPont*, *supra*, holding that the business of a corporation cannot be regarded as the business of its shareholders. The non-

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *.

* * * * * * *

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

business deduction was denied on basically the same grounds, this Court stating in its opinion that "the expense must be 'ordinary and necessary' and it must be such an expense as is personal to the taxpayer and immediately related to his own income or property."

In *Friedman* v. *Delaney*, 75 F. Supp. 568 (D. Mass. 1948), affirmed on this point 171 F. 2d 269 (C.A. 1, 1948), the taxpayer was a practicing attorney. He paid a $5,000 debt owed by one of his clients and claimed it as a deduction under section 23(a)(1)(A) as a business expense of his law practice. In holding against the taxpayer, Judge Wyzanski, in his opinion, said:

If a lawyer pays the debt of his client the payment is not deductible, regardless of whether the payment was requisite to keep in business a client who had brought, was bringing and was expected to bring much legal work to the lawyer. There are several reasons for holding that the deduction does not come within § 23(a)(1). The payment proximately results not from carrying on the taxpayer's business but from carrying on the client's business. *Deputy* v. *DuPont*, 308 U.S. 488, 494 * * *. There is no evidence that it is a transaction of common or frequent occurrence in the business of practicing law. *Id.*, 308 U.S. p. 495, 60 S. Ct. 367. * * *

We think the language just quoted from the opinion in *Friedman* v. *Delaney*, is equally applicable to the facts in the instant case.

Petitioner relies heavily upon our decisions in the cases of *Charles J. Dinardo*, 22 T.C. 430, and *Cubbedge Snow*, 31 T.C. 585, as supporting their contentions. We think those cases are distinguishable. In the *Dinardo* case, the members of a partnership formed for the practice of medicine paid the operating deficits of a hospital incorporated as a nonprofit corporation, and were allowed such payments as a deduction under section 23(a)(1)(A), *supra*. Likewise, in the *Snow* case the lawyer-petitioners had been instrumental in establishing a Federal savings and loan association, which had no capital stock and in the profits of which they had no proprietary interest. In conjunction with certain other individuals, they had undertaken to make good any operating deficits incurred by the association until such time as it was on a profitable basis. As it developed, deficits were incurred which the petitioners were called upon to cover. Here, too, the amounts so paid were allowed as deductions under section 162(a) of the 1954 Code, which is for our purposes here the same as section 23(a)(1)(A) of the 1939 Code. The basis for our decisions in those cases was stated in the *Snow* case as follows (p. 596):

We think that the essential underlying facts in *Dinardo* and in the instant case are indistinguishable. In *Dinardo*, the doctors were already practicing and merely wanted to protect and augment their practices. Similarly, petitioners' law firm had an abstract plant and sought to protect and supplement their income from legal fees by obtaining additional abstract clients. The Association (as well as the hospital) was in operation when the payments were made. In both instances, the taxpayers were, at least in some measure, economically affected by the existence of the institutional facilities which they agreed to

underwrite. Thus, the doctors would not earn the medical fees from patients hospitalized at Collinwood if they didn't maintain the facilities, and the law firm would not get the abstract business of the Association if it were not in operation.

In both the *Dinardo* and *Snow* cases we regarded the expenditures there in question as being directly connected with or pertaining to the taxpayer's trade or business rather than to the hospital or the association. Here, the expenditures in question are directly connected with the trade or business of the corporation and not with petitioner's trade or business.

Petitioner herein has not shown that the expenditure in issue was in any way related to his law practice. Accordingly, it seems clear, even without regard to the fact that the payments made by the petitioner were for the admitted purpose of protecting his capital investment in the corporation, that his claim for a business expense deduction under section 23(a) (1) (A), *supra*, is without foundation.

The same conclusion must follow with regard to petitioner's claim for a nonbusiness deduction under section 23(a) (2), *supra*. The expenditure of $8,890.50 was made to further the business of the corporation; it was not in fact and in law an expense of the petitioner. Consequently, the deduction must be denied.

We hold that no error was committed by the respondent in disallowing the claimed deduction.

*Decision will be entered for the respondent.*