## Walton O. Hewett and Virginia H. Hewett, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 5816-64. Filed February 13, 1967.

*Ross Arnold, Jr.*, for the petitioners.
*Thomas A. Brown*, for the respondent.

Drennen, *Judge:* Respondent determined a deficiency in petitioners' income tax for the taxable year 1962 in the amount of $19,441.53.

The sole issue remaining for decision is whether petitioners are entitled to a deduction of $30,000, the par value of stock in a corporation owned by petitioner transferred by petitioner to two individuals as commissions for sale of unissued stock of the corporation, either as an "ordinary and necessary" business expense under section 162, I.R.C. 1954,[1] or as a nonbusiness expense incurred for the production of income, or for the conservation of property held for the production of income, under section 212.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulated facts are incorporated herein by this reference.

---

[1] All statutory references are to the Internal Revenue Code of 1954 except where otherwise noted.

Petitioners are husband and wife who resided in Atlanta, Ga. For the taxable year 1962, petitioners filed a joint Federal income tax return with the district director of internal revenue, Atlanta, Ga. Walton O. Hewett is referred to herein as petitioner.

Prior to 1963 petitioner had engaged in the business of school photography as an individual. On September 30, 1953, petitioner incorporated his business under the name "Hewett Studios, Inc." (hereinafter, Studios, Inc.). From the date of its incorporation, September 30, 1953, to July 1, 1962, petitioner owned all the issued and outstanding stock of Studios, Inc., and was its president and sole manager. For audit purposes, Studios, Inc., operated on a fiscal year ending June 30.

Prior to 1956 the business of petitioner and then Studios, Inc., had consisted principally of the school photography business, which had always produced a profit. In 1956 Studios, Inc., entered into the school year-book business. This business was not profitable and Studios, Inc., began losing money. Petitioner found it necessary to borrow money in behalf of the corporation and he was usually required to sign the notes evidencing the loans to the corporation as endorser or guarantor. He was also required to mortgage his home and the property occupied by the business, which petitioner owned personally and leased to the corporation, as security for some of these loans.

In early 1962 petitioner realized that Studios, Inc., was operating at a considerable loss that year, due to the yearbook business, and that it was in bad condition financially. Petitioner was having considerable difficulty borrowing money which the corporation needed to operate, either in the corporate name or in his own name. He realized that the corporation would have to give up the yearbook business, but he felt that if the business could raise sufficient funds to weather the storm of its then crucial financial condition until it could return to the school photography business exclusively, it could be placed back on a profitable basis.

In the spring of 1962, because of the pressing financial crisis in the business, petitioner engaged a certified public accountant to conduct and complete an immediate audit of Studios, Inc, for the 11-month period beginning July 1, 1961, and ending May 31, 1962. This audit revealed that for the period involved Studios, Inc., had an operating loss of $84,378.93. The audit also revealed that as of May 31, 1962, Studios, Inc., had current assets totaling $115,274.43 and fixed and other assets totaling $358,136.41, for total assets of $473,-410.84. However, the fixed and other assets included a liability of $72,663.96 "Due from Officer" (petitioner), and "Property, Plant and Equipment" at an appraised value of $278,337.83, which was $158,-620.55 in excess of its cost. The audit also revealed that as of May 31, 1962, Studios, Inc., had current liabilities totaling $228,961.24 and other liabilities and deferred income totaling $38,661.83. Its

capital included common stock—$30,000; retained earnings—$17,-167.22; and markup of plant and equipment over cost of $158,620.55. About $63,000 of the current liabilities were notes evidencing money borrowed in the name of the corporation, bearing interest at the rate of 16–16½ percent, which were also endorsed by petitioner individually and were secured by mortgages on real estate owned by petitioner individually.

Petitioner decided that the only way additional money could be obtained to meet the corporation's operating expenses and pay its debts when due was to sell stock of the corporation to the public.

Prior to June 15, 1962, Studios, Inc., had issued and outstanding 300 shares of its $100 par common stock, all of which was owned by petitioner and in which petitioner had a basis of $30,000. On June 15, 1962, Studios, Inc., declared a stock dividend of 13 shares on each share of stock outstanding. The additional 3,900 shares of stock having a par value of $390,000 were issued to petitioner. On June 22, 1962, petitioner received 52.47 shares of the $100 par value stock as part payment for certain land and a building which petitioner sold to Studios, Inc. On July 1, 1962, petitioner purchased 647.32 shares of the $100 par value stock from Studios, Inc.

On July 25, 1962, all of the $100 par value stock of Studios, Inc., was "reissued" as $1 par value capital stock. As a result of the exchange petitioner then owned 489,979 shares of the $1 par value stock of Studios, Inc., which was all of its issued and outstanding stock. The authorized stock of Studios, Inc., at this time was about 1 million shares.[2]

At sometime during the year 1962 petitioner entered into an agreement with James E. Casey and R. L. Winn whereby the latter agreed to make an effort to sell unissued stock of Studios, Inc., to third parties. There was no specific agreement between the parties concerning the compensation Casey and Winn would receive for their efforts, but petitioner made it clear to them that it would have to be paid in stock of Studios, Inc. Casey and Winn were successful in their efforts to sell the stock and by December of 1962 had sold between 120,000 and 125,000 shares of the corporation's stock to third parties for $1 per share. The shares sold to third parties were issued by the corporation from its authorized but unissued stock and the corporation received all of the proceeds of sale.

At sometime after July 25 during the year 1962 petitioner transferred 20,000 shares of his personally owned $1 par value stock in Studios, Inc., to Casey, and 10,000 shares of such stock to Winn. The stock was transferred to Casey and Winn as a commission for their sales of unissued stock of Studios, Inc., to third parties. The number

---

[2] According to the testimony of petitioner.

of shares transferred was apparently mutually agreed upon between the parties after the stock had been sold. Petitioner transferred shares issued in his name rather than having the corporation issue the additional shares because "even though I incorporated in '53, from the time I went in business in '46, I just felt that I was the company, and the company was me, and the first thought that entered my mind was just pay the stock from my personal stock. Nothing else entered my mind at that time."

The money raised by the sale of stock to third persons was apparently enough to permit Studios, Inc., to weather the storm and it has operated at a profit since 1962.

Petitioner received a salary from Studios, Inc., in 1962 in the amount of $12,325.83, which he reported on his income tax return for 1962. He also reported salary received from another corporation controlled by him in the amount of $10,000, net long-term capital gain in the amount of $29,519.18 (principally from the sale of certain land and buildings), and income from rents and royalties totaling $1,321.69. Also attached to petitioner's return for the year 1962 was a Schedule C, Profit (or Loss) from Business or Profession, on which the name of the business was reported to be "Walton O. Hewett," the principal business activity was "Photography," and the product was "School Pictures." The gross receipts of the business were reported as zero and the only deduction claimed was $32,650, which was explained as follows:

This represents amounts paid by taxpayer in 1962 to individuals associated with him as employees of the same Companies that employ him and as advisors. These fees were paid as compensation for services they rendered to taxpayer in serving his customers and territories; in conserving and developing his income and income producing investments; and in aiding his business interests in other ways. These were ordinary and necessary expenses to taxpayer; were not reimbursed to him; and were reported on Forms 1099 for 1962:

| | |
|---|---:|
| James E. Casey—Anniston, Ala | $20,000.00 |
| R. L. Winn—Ohatchee, Ala | 10,000.00 |
| C. W. Wright—Vacaville, Calif | 2,650.00 |
| | 32,650.00 |

The resulting net loss of $32,650 was reported on the first page of petitioner's return as a business loss.

In his notice of deficiency respondent disallowed the entire $32,650 as a deduction. Petitioners concede that $2,650 of this amount is not deductible.

OPINION

The issue is whether petitioner is entitled to deduct the par value of 30,000 shares of stock of Studios, Inc., which he personally transferred to two individuals as commissions for selling authorized but unissued stock of Studios, Inc., either under section 162 or section 212 of the 1954 Code.

On their return for 1962 petitioners claimed the par value of the stock ($30,000 of which is in issue) as an expense of a photography business operated by Walton Hewett in his individual capacity. There is no evidence that petitioner was engaged in the photography business in his individual capacity in 1962. He reported no income from it and claimed no other expenses. It is clear from the record that the photography business in which petitioner was active was conducted by and in the name of the corporation, Studios, Inc. The $30,000 in issue was not an ordinary and necessary expense of a business conducted by petitioner in his individual capacity and he is not entitled to deduct it as such on his individual return. Petitioner does not stress this claim on brief. The business of the corporation was not that of its stockholder, even though he owned all of its stock; see *Deputy* v. *du Pont*, 308 U.S. 488; *Dalton* v. *Bowers*, 287 U.S. 404.[3]

Petitioners' principal argument on brief is that the commissions were ordinary and necessary expenses paid for the "production or collection of income" or for the "management, conservation, or maintenance of property held for the production of income," and are therefore deductible as a "nonbusiness expense" authorized by section 212(1) or section 212(2).[4]

It is to be noted that section 212, which had its origin in section 121 of the Revenue Act of 1942, 56 Stat. 798, has neither the purpose nor the effect of enlarging the area of allowable deductions; it is to be considered *in pari materia* with section 162; and it provides for a class of deductions coextensive with "business" deductions but for the requirement that the income-producing activity be a trade or business. *United States* v. *Gilmore*, 372 U.S. 39. It merely enlarged the category of incomes with respect to which expenses are deductible. See *McDonald* v. *Commissioner*, 323 U.S. 57, 62.

Therefore, the deduction sought by petitioner must be "ordinary and necessary" to "the production or collection of income" or to the "management, conservation, or maintenance of property held for the production of income." Furthermore, the expense must be reasonable in amount and "proximately related" to the nonbusiness, income-producing activity *of the petitioner*. *Trust of Bingham* v. *Commissioner*, 325 U.S. 365; sec. 1.212–1(d), Income Tax Regs.

---

[3] Petitioner does not claim that he was engaged in the business of promoting or financing corporations or dealing in securities. See *Burnet* v. *Clark*, 287 U.S. 410; *Whipple* v. *Commissioner*, 373 U.S. 193. Nor does he claim that this payment was an ordinary and necessary expense of his business of being an employee. See *Trent* v. *Commissioner*, 291 F. 2d 669, reversing 34 T.C. 910.

[4] SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; * * *

As with "business" expenses, deductible under section 162, "non-business" expenses are deductible only if they represent an expense of the taxpayer, himself. In this regard, the following statement from the opinion in *Jacob M. Kaplan*, 21 T.C. 134, 146, is relevant:

Insofar as the petitioner's expenditures related to the production or collection of income or to the management, conservation, or maintenance of property held for the production of income, it was to the income or property of the corporations and not to that of petitioner. As a general rule, for tax purposes a corporation is an entity distinct from its stockholders. *Dalton* v. *Bowers*, 287 U.S. 404. Deductions are personal to the taxpayer and one taxpayer may not take deductions properly belonging to another. *Hal E. Roach*, 20 B.T.A. 919. Although the corporations may prosper and flourish, no taxable income is realized by the stockholders until the profits are distributed to them. The statute contemplates the deduction of only such ordinary and necessary nontrade or nonbusiness expenses as are personal to the taxpayer. Only those expenses *proximately and immediately relating to his own income or property are deductible.* * * * [Emphasis supplied.]

Also, in *Bert B. Rand*, 35 T.C. 956, this Court stated that "nonbusiness" deductions are allowable only if they are ordinary and necessary and are expenses "immediately related to the taxpayer's *own income or property.*" (Emphasis supplied.) Cf. *Deputy* v. *du Pont, supra.*

The contention that the deduction is allowable as an expense paid or incurred for the "production or collection of income" can be disposed of summarily. The expenditure was not directly or immediately related to the production of petitioner's income. It was more directly related to the production of the corporation's income. There is no evidence that the activities of Casey and Winn directly related to duties petitioner was required to perform in order to earn his salary, or to earn commissions, or that those activities directly enhanced petitioner's income. This Court has held that even though the expenditure by a stockholder might cause the corporation to prosper, a deduction was not allowable to the stockholder since it would be the income and property of the corporation which would be immediately benefited. *Harry Kahn*, 26 T.C. 273. The Memorandum Opinions of this Court [5] cited by petitioner are thus distinguishable and do not support his contention. It is likewise evident that the expenditure was not related to the "management" or "maintenance" of property held by petitioner for the production of income.

The main thrust of petitioners' argument seems to be that the expenditure was an ordinary and necessary expense paid or incurred in the "conservation" of property held by petitioner for the production of income. Petitioner contends that his income-producing property was the stock of Studios, Inc., which he owned, and that his transfer of the 30,000 shares to Casey and Winn was to protect and conserve his remaining stock which was, he contends, his sole source of income.

---

[5] *Aldo R. Balsam Trust* (1944) ; *William J. Laidlaw* (1944) ; *John S. Thompson* (1950).

We are satisfied from the evidence that petitioner had exhausted all practicable sources of credit for the business prior to the sale of shares of stock of the corporation and that the sale of stock was about the only available source from which the funds required to continue the business could be obtained. We also recognize that the payment of commissions to salesmen for selling the stock was required. It could thus be said that the payment of the commissions was necessary to the continuation of the business, at least to the extent that it was "appropriate and helpful" for that purpose. See *Welch* v. *Helvering*, 290 U.S. 111. But this does not mean that it was "necessary" for the conservation of *petitioner's* income-producing property; the business was that of the corporation and we have no evidence why the corporation could not have issued its authorized but unissued stock in payment of these commissions to protect its business rather than for petitioner to transfer his own shares to the salesmen.

Nor do we think the record supports a finding that petitioner's transfer of shares of stock to Casey and Winn was an "ordinary" expense paid for the conservation of his income-producing property.

In *Welch* v. *Helvering*, *supra*, there may be found an interpretation of the word "ordinary" as it is used in the statute. There, the taxpayer took over the business of a corporation which had been adjudged bankrupt and had a discharge from its debts. The taxpayer, in order to protect his credit rating and goodwill and reputation, paid off former creditors of the corporation over a 5-year period. The Supreme Court held that the taxpayer could not deduct the payments to former creditors as being "ordinary and necessary." The Court stated that—

Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily, not even though the result might be to heighten their reputation for generosity and opulence. Indeed, if language is to be read in its natural and common meaning * * * we should have to say that payment in such circumstances, instead of being ordinary is in a high degree extraordinary. There is nothing ordinary in the stimulus evoking it, and none in the response. * * *

* * * Unless we can say from facts within our knowledge that these are ordinary and necessary expenses according to the ways of conduct and the forms of speech prevailing in the business world, the tax must be confirmed. * * *

In our opinion a stockholder's transfer of his own shares to salesmen as consideration for the sale of shares of unissued stock for the corporation would not be a "normal, useful, or customary," or, in any sense an "ordinary," expense of a stockholder's attempt to conserve or enhance the value of his own stock; and nothing in this record nor in the realm of common knowledge or experience makes it so in this case. See *Deputy* v. *du Pont, supra*.

Even if we assume, as did the Supreme Court in *Deputy* v. *du Pont*, that petitioner's business [6] was the conservation of his individual estate, we could not find that this expenditure was "ordinary" for that purpose. Even with this assumption, the Supreme Court determined, in *Deputy* v. *du Pont*, that an expense paid by a stockholder for purposes of the corporation was not "ordinary." In that case the du Pont company had formed an executive committee comprised of nine young executives and devised a stock purchase plan whereby the executives were to have an interest in the company. But, for business and legal reasons the company could not sell the shares itself, and du Pont, an individual with beneficial ownership of some 16 percent of the outstanding stock of the company, agreed to borrow shares of the stock of the company from a related corporation and to sell the borrowed stock to the executive group. In brief, du Pont was to pay to the related corporation certain charges until he had returned the borrowed shares, and he sought to deduct the amount of those charges. It seems undisputed that, as a major stockholder of the company, du Pont would benefit from the transaction and that his stockholdings would be enhanced and conserved by his sale to the executives. Yet the Supreme Court denied the deduction on two grounds: The expense was not shown to be "ordinary" in business parlance or practice; and the expense arose not from du Pont's business but from the business of the company.

These conclusions, derived from the opinions in the above cases, offer principles governing the issue under review. We are bound to conclude that there has been no showing that petitioner's transfer of stock to the salesmen was "ordinary or necessary" for any business of petitioner's or for the production of his income or the conservation of his income-producing property. We find that the transaction arose from the business of Studios, Inc., and was proximately related only to that business. And, the corporate business cannot be blended with petitioner's individual activities.

We need not decide the measure of the claimed deduction if allowable, and we do not reach the question, to which respondent alludes on brief, of whether petitioner, by transferring the shares, thereby made a capital contribution to Studios, Inc.

*Decision will be entered for the respondent.*

---

[6] *Deputy* v. *du Pont*, 308 U.S. 488 (1940), was decided prior to the enactment of sec. 23(a) (2), I.R.C. 1939, allowing "nonbusiness" expenses. The assumption that du Pont's "business" was the conservation and enhancement of his estate was meaningful only when it is understood that the Court's assumption of a "nonbusiness" expense would have availed du Pont nothing.